I

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOHN ROBB,

    Petitioner,       No. CIV S-05-2265 GEB CHS P

  vs.

TOM L. CAREY,

    Respondent.       FINDINGS AND RECOMMENDATIONS

/

       Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges the March 8, 2001 decision by the Board of Parole Hearings (hereinafter Board) finding petitioner unsuitable for parole. Petitioner claims that the Board's decision violated his right to due process and was the result of a predetermined "no parole policy."[1] Upon careful consideration of the record and the applicable law, the undersigned will recommend that this petition for habeas corpus relief be denied.

/////

---

[1] Additionally petitioner raises several other claims concerning determinations of California state law by California state courts. These claims are not cognizable federal habeas claims and this court will not address those claims. See Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("It is not the province of a federal habeas court to reexamine state court determinations on state law questions.")

1

PROCEDURAL AND FACTUAL BACKGROUND

Petitioner entered the California Department of Corrections on March 12, 1982, as a result of convictions for murder in the first degree and attempted murder in the second degree. Answer, Ex. 1 at 7. Petitioner sentence is 27 years-to-life. Id.

The circumstances of petitioner's conviction offenses were described at petitioner's March 8, 2001 parole suitability hearing, as follows:

> PRESIDING COMMISSIONER GRANLUND: Okay. Mr. Robb, we've got a few things to go over here with you today on you (sic) commitment offenses. It says here that Robb and co-defendants Brian Wayne Thomas, T-H-O-M-A-S, Angela Heidki, H-E-I-D-K-I and Lisa Grow, G-R-O-W, designed a ruse to lure Harold Wineberg, W-I-N-E-B-E-R-G, the victim, away from his apartment long enough to allow Robb to ransack it and find jewelry Wineberg stole from Grow. You planned to rough him up and take him to the county line and leave him. On January 18th, 1980, Thomas telephoned the victim and asked him to come over and sell him some cocaine. While Thomas waited for the victim, Robb and Grow hid in the apartment. When Wineberg arrived, Thomas struck him in the head with a pipe, with little effect. Robb came into the room with a gun and pointed it at the victim's face and warned him not to move or he would be killed. Thomas handcuffed the victim's hands behind his back. He and Robb took turns kicking and beating the victim. Robb used a club on him. The victim pleaded to be killed. He was then tied up, gagged and placed into a blanket and put into the trunk of a 1976 Ford Granada. While Grow stayed in the apartment to clean up, Robb and Thomas drove the victim to the county line near Lancaster. Thomas pulled the victim out of the trunk and put him on his knees. Robb shot the victim in the head area. The victim fell to the ground and started making, quote, gross sounds. Robb reloaded the gun and fired five more times. They removed the victim's pants, socks, and the blanket in which he was wrapped and a couple of other things and put them in the trunk. After they removed the blood from themselves they drove away and threw the gun into the water at the aqueduct. That's – that's the first crime of your commitment offense. Anything you want to add or tell us about that, in your own words?
>
> INMATE ROBB: The – the part there about beating Henry – Harold Wineberg, that's wrong. I didn't beat him up. I killed him but I didn't – I shot him, like it states there, but all that had been done before I entered into the house.
>
> . . .

| | |
|---|---|
| 1 | PRESIDING COMMISSIONER GRANLUND: Okay we'll move on. The second crime was attempted murder and use of a bomb, and that's count number six. And in that count, apparently the victim, Donald Larrison, he was in the process of a divorce from his wife, Mrs. Larrison. She hired or engaged you – to kill her husband and you had a couple of plans to do that. One was to have Heidi (sic) Heidki, H-E-I-D-K-I, go to his apartment or his home and get him to participate in drinking and drug him and then the plan was to inject him with battery acid or an air bubble from a syringe to kill him. And when that plot failed, then the next idea was to bomb his car. And then you placed what appeared to be a bomb or what looked like a bomb in his car, or on his car, which the police found and dismantled or took away. Is – that correct? His wife was Jeanie or Jeannine, J-E-A-N-N-I-N-E Larrison, L-A-R-R-I-S-O-N. And Mrs. Larrison was apparently involved with you at the time in a romantic relationship? |

PRESIDING COMMISSIONER GRANLUND: Okay we'll move on. The second crime was attempted murder and use of a bomb, and that's count number six. And in that count, apparently the victim, Donald Larrison, he was in the process of a divorce from his wife, Mrs. Larrison. She hired or engaged you – to kill her husband and you had a couple of plans to do that. One was to have Heidi (sic) Heidki, H-E-I-D-K-I, go to his apartment or his home and get him to participate in drinking and drug him and then the plan was to inject him with battery acid or an air bubble from a syringe to kill him. And when that plot failed, then the next idea was to bomb his car. And then you placed what appeared to be a bomb or what looked like a bomb in his car, or on his car, which the police found and dismantled or took away. Is – that correct? His wife was Jeanie or Jeannine, J-E-A-N-N-I-N-E Larrison, L-A-R-R-I-S-O-N. And Mrs. Larrison was apparently involved with you at the time in a romantic relationship?

INMATE ROBB: Yes, Sir.

PRESIDING COMMISSIONER GRANLUND: True?

INMATE ROBB: Jeannie Larrison, yes, Sir.

PRESIDING COMMISSIONER GRANLUND: Tell – tell us just a little bit more about that.

INMATE ROBB: Jeannie Larrison knew what happened to Henry Wineberg. You call him Henry Wineberg, I knew him as Skip Burton, B-U-R-T-O-N. She knew that he had gotten killed and she knew I did it. So she was tired of – her husband was giving her a lot of problems, so yeah, she wanted me to kill her husband. Now, about the battery acid and all that, air bubble stuff and everything, that's – that's Angela Heidki, she was talking about that and mentioned it and everything but the bomb was done and the reason that I wired the bomb the way it was is so that the man would know that something seriously is going to be happening to him and he did the right thing, by going to the cops. The reason I say that is because, I put the spark plug in the rubber instead of in the metal, so that way the wire would be seen on the ground, like he saw it, and then he would go to the cops. Because I – Larrison, Jeannie Larrison had friends and I didn't want any problems with them and a lot of other stuff that was going on, so I was afraid to go and let him know that he was in trouble, so I left the bomb like that.

/////

(Answer, Ex. 1. at 12-17.)

At petitioner's March 8, 2001 parole consideration hearing the Board found petitioner unsuitable for parole. (Id. at 68.) The Board concluded that petitioner "would pose

3

an unreasonable risk of danger to society or a threat to public safety if released from prison." Id.

/////

/////

On May 23, 2001, petitioner filed an administrative appeal with the Board of Prison Terms Office of Policy and Appeals, which was denied on October 9, 2001. On October 26, 2001, petitioner filed a habeas petition in the Solano County Superior Court. On November 14, 2001, the Superior Court denied the petition upon the ground that petitioner failed to exhaust the available administrative remedies.

On January 29, 2002, petitioner filed a habeas petition in the appellate court. On February 7, 2002, the appellate court denied the petition without prejudice to filing another petition in the Los Angeles Superior Court based upon In re Sena, 94 Cal.App.4th 836, 839 (Cal.App. 2001) (challenge to the denial of parole is a challenge to the sentence and should be brought in the sentencing court), and In re Hillery, 202 Cal.App.2d 293, 294 (Cal.App. 1962) (where appellate court has original jurisdiction over habeas petition, it may dismiss upon ground application was not made in lower court).

On February 21, 2002, petitioner sought rehearing. The appellate court transferred the matter to the California Supreme Court. On February 28, 2002, the California Supreme Court notified petitioner it had received his petition for review, but it was late and petitioner had until March 11, 2002, to file an Application for Relief from Default showing good cause for permitting his late filing. The court also advised petitioner he could file a habeas petition and sent him the appropriate form.

On March 7, 2002, petitioner filed in the California Supreme Court an Application for Relief from Default, a petition for review of the appellate court's decision and a petition for a writ of habeas corpus. On July 31, 2002, the court denied the petition. Petitioner then sought habeas relief in the United States District Court for the Eastern District of California in Case No. CIV S-02-2648 EJG PAN, filed December 11, 2002. By court order filed February 19, 2004, claims 2 and 4 were denied with prejudice and claims one, three, five, six, seven, and eight were dismissed without prejudice.

Petitioner then filed an application for habeas relief in Los Angeles Superior Court on March 8, 2004, which was denied on July 6, 2004. Petitioner filed an appeal in the California Court of Appeal for the Second Appellate District on August 8, 2004. That appeal was denied on September 24, 2004. Petitioner then filed a petition with the California Supreme Court on October 29, 2004, which

4

was denied September 7, 2005.

Petitioner filed the instant petition for review in this court on November 8, 2005.

/////

See February 28, 2007 Findings And Recommendations by Magistrate Judge Brennan at 1-3, and the order adopting them by the District Judge signed March 22, 2007.[2]

## ANALYSIS

A. <u>Standards for a Writ of Habeas Corpus</u>

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. <u>Early v. Packer</u>, 537 U.S. 3, 7 (2002) (<u>citing</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

---

[2] Respondent notes in his Answer, that he is again raising a procedural default claim to preserve the issue on appeal. Answer at 10. As this claim has already been ruled on, the undersigned will not address it.

5

prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'") (internal citations omitted).

B. Petitioner's Claims

 I. Due Process

  Petitioner repeatedly claims that the Board's decision finding him unsuitable for parole violated his due process rights. Perhaps most relevant, petitioner specifically claims that the Board violated his right to due process by "continuing to deny Robb parole without good cause relying on case factors which cannot change." Petition at 32.

  a. Applicable Law

  The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law. A person alleging due process violations must first demonstrate that he or she was deprived of a liberty or property interest protected by the Due Process Clause and then show that the procedures attendant upon the deprivation were not constitutionally sufficient. Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 459-60 (1989); McQuillion v. Duncan, 306 F.3d 895, 900 (9th Cir. 2002).

  A protected liberty interest may arise from either the Due Process Clause of the United States Constitution or state laws. Board of Pardons v. Allen, 482 U.S. 369, 373 (1987). The United States Constitution does not, of its own force, create a protected liberty interest in a parole date, even one that has been set. Jago v. Van Curen, 454 U.S. 14, 17-21 (1981). However, "a state's statutory scheme, if it uses mandatory language, 'creates a presumption that

1  parole release will be granted' when or unless certain designated findings are made, and thereby
2  gives rise to a constitutional liberty interest." McQuillion, 306 F.3d at 901 (quoting Greenholtz
3  v. Inmates of Nebraska Penal, 442 U.S. 1, 12 (1979)).  In this regard, it is clearly established that
4  California's parole scheme provides prisoners sentenced in California to a state prison term that
5  provides for the possibility of parole with "a constitutionally protected liberty interest in the
6  receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of
7  the Due Process Clause." Irons v. Carey, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing Sass v.
8  Cal. Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006); Biggs v. Terhune, 334 F.3d 910,
9  914 (9th Cir. 2003); McQuillion, 306 F.3d at 903; and Allen, 482 U.S. at 377-78 (quoting
10 Greenholtz, 442 U.S. at 12)).  Accordingly, this court must examine whether the deprivation of
11 petitioner's liberty interest in this case violated due process.

12       It has been clearly established by the United States Supreme Court "that a parole
13 board's decision deprives a prisoner of due process with respect to this interest if the board's
14 decision is not supported by 'some evidence in the record,' Sass, 461 F.3d at 1128-29 (citing
15 Superintendent v. Hill, 472 U.S. 445, 457 (1985)); see also Biggs, 334 F.3d at 915 (citing
16 McQuillion, 306 F.3d at 904), or is "otherwise arbitrary," Hill, 472 U.S. at 457.

17       When assessing whether a state parole board's suitability decision was supported
18 by "some evidence," the analysis "is framed by the statutes and regulations governing parole
19 suitability determinations in the relevant state." Irons, 505 F.3d at 851.  Thus, this court must:

> look to California law to determine the findings that are necessary
> to deem a prisoner unsuitable for parole, and then must review the
> record in order to determine whether the state court decision
> holding that these findings were supported by "some evidence" in
> [petitioner's] case constituted an unreasonable application of the
> "some evidence" principle articulated in Hill.

23 Id.

24       California law requires that the Board "determine whether a prisoner is presently
25 too dangerous to be deemed suitable for parole based on the 'circumstances tending to show
26 unsuitability' and the 'circumstances tending to show suitability' set forth in Cal.Code. Regs., tit.

7

15 § 2402(c)-(d)." Irons, 505 F.3d at 662-63.

The Irons court described the regulations as follows:

> [T]he circumstances tending to show that a prisoner is unsuitable include: (1) the commitment offense, where the offense was committed in "an especially heinous, atrocious or cruel manner"; (2) the prisoner's previous record of violence; (3) "a history of unstable or tumultuous relationships with others"; (4) commission of "sadistic sexual offenses"; (5) "a lengthy history of severe mental problems related to the offense"; and (6) "serious misconduct in prison or jail." Cal.Code. Regs., tit. 15 § 2402(c). Circumstances tending to show that a prisoner is suitable for parole include: (1) the prisoner has no juvenile record; (2) the prisoner has experienced reasonably stable relationships with others; (3) the prisoner has shown remorse; . . . (6) the prisoner lacks any significant history of violent crime; . . . (8) the prisoner "has made realistic plans for release or has developed marketable skills that can be put to use upon release"; (9) "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." Cal.Code. Regs., tit. 15 § 2402(d).

Id. at 663 n.4.

In California, the overriding concern in determining parole suitability is public safety and the focus is on the inmate's current dangerousness. In re Dannenberg, 34 Cal. 4th 1061, 1086 (Cal. 2005); In re Lawrence, 44 Cal. 4th 1181, 1205 (Cal. 2008). The California Supreme Court recently stated:

> [T]he Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety [and] the core determination of "public safety" . . . involves an assessment of an inmate's *current* dangerousness. . . . [A] parole release decision authorizes the Board (and the Governor) to identify and weigh only the factors relevant to predicting "whether the inmate will be able to live in society without committing additional antisocial acts." These factors are designed to guide an assessment of the inmate's threat to society, *if released*, and hence could not logically relate to anything but the threat *currently* posed by the inmate.

In re Lawrence, 44 Cal. 4th at 1205-06 (internal citations omitted). Accordingly, in reviewing a decision by the Board to deny parole to an inmate, "the relevant inquiry is whether some evidence supports the decision of the Board that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual

8

1  findings." Id. at 1212 (citing In re Rosenkrantz, 29 Cal. 4th 616, 658 (Cal. 2002); In re

2  Dannenberg, 34 Cal. 4th at 1071; In re Lee, 143 Cal. App. 4th 1400, 1408 (2006)).

3     "The 'some evidence' standard is minimally stringent," and a decision will be

4  upheld if there is any evidence in the record that could support the conclusion reached by the

5  fact-finder. Powell, 33 F.3d at 40 (citing Cato v. Rushen, 824 F.2d 703, 705 (9th Cir. 1987));

6  Toussaint v. McCarthy, 801 F.2d 1080, 1105 (9th Cir. 1986). However, "the evidence

7  underlying the [ ] decision must have some indicia of reliability." Jancsek, 833 F.2d at 1390.

8  See also Perveler, 974 F.2d at 1134. Determining whether the "some evidence" standard is

9  satisfied does not require examination of the entire record, independent assessment of the

10 credibility of witnesses, or the weighing of evidence. Toussaint, 801 F.2d at 1105. The question

11 is whether there is any reliable evidence in the record that could support the conclusion reached.

12 Id.

13    b. Discussion

14    The Board's determination of unsuitability was based on its finding that:

> The offense was carried out in an especially cruel and callous manner. The offense was carried out in dispassionate and calculated manner, such as an execution-style murder. The offense was carried out in a manner which demonstrates an especially callous disregard for human suffering. The motive for the crime was inexplicable and very trivial in relation to the offense. The murder of the victim did not deter the prisoner from later committing another criminal offense. Specifically, the attempted murder of Donald Larrison. These conclusions are drawn from the Statement of Facts, wherein the prisoner, in the most brutal and callous manner, lured Mr. Wineberg to an ambush at a crime partner's home to sell drugs. He was bound, beat and tortured and executed, being shot nine times. The prisoner, has on previous occasions, inflicted or attempted to inflict serious injury on a victim, [and has] a record of violent or assaultive behavior. He has demonstrated an escalating pattern of criminal conduct and violence. He has a history of unstable and tumultuous relationships with others. He previously sexually assaulted another in a manner calculated to inflict unusual pain and fear upon the victim. He has failed previous grants of parole and cannot be counted upon to avoid criminality. He has failed to profit from society's previous attempts to correct his criminality. Such attempts include parole, prison terms, and a very generous

>plea bargain for the crimes leading to his first prison offense. An unstable social history and prior criminality which includes rape and burglary for which was (sic) served in state prison, only to commit an even more violent crime just six months after being released. The hearing Panel noted that responses to PC 3042 notices indicate opposition to a finding of parole suitability, specifically the testimony of the District Attorney from Los Angeles County. The Panel makes the following finding: the prisoner needs therapy in order to face, discuss, understand and cope with stress in a nondestructive manner. Until progress is made, the prisoner continues to be unpredictable and a threat to others.

/////

Answer, Ex. 2 at 68-70.

The Board essentially relied on three key factors to support its finding of unsuitability: (1) factors relating to the prior commission offense; (2) petitioner's previous record of violence; and (3) petitioner's prior commission of sadistic sexual offenses. The undersigned will examine these factors.

(1) <u>Factors Relating to the Prior Commission Offense</u>

The Board found petitioner's commitment offense of first degree murder "was carried out in an especially cruel and callous manner," "in [a] dispassionate and calculated manner, such as an execution-style murder," "in a manner which demonstrate[d] an especially callous disregard for human suffering" and that the "motive for the crime was inexplicable and very trivial in relation to the offense." <u>Id.</u> at 68.

The terms used by the Board have been defined by the California courts as follows:

>A prisoner's commitment offense may constitute a circumstance tending to show that a prisoner is presently too dangerous to be found suitable for parole, but the denial of parole may be predicated on a prisoner's commitment offense only where the Board can "point to factors beyond the minimum elements of the crime for which the inmate was committed" that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released. <u>[In re] Dannenberg</u>, 34 Cal.4th [1061] at 1071, 23 Cal.Rptr.3d 417, 104 P.3d 783 (Cal.2005). Factors beyond the minimum elements of the crime include, <u>inter alia</u>, that "[t]he offense was carried out in a dispassionate and calculated

10

        manner," that "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and that "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Cal.Code. Regs., tit. 15 § 2402(c)(1)(B), (D)-(E)."

Irons at 663; see also In re Weider, 145 Cal.App.4th 570, 588 (2006) (to support denial of parole, the "factors beyond the minimum elements of the crime" "must be predicated on "some evidence that the particular circumstances of [the prisoner's] crime-circumstances beyond the minimum elements of his conviction-indicated exceptional callousness and cruelty with trivial provocation, and thus suggested he remains a danger to public safety.")

        Similarly, in In re Scott the court noted that a finding of "triviality" sufficient to justify the denial of parole must also relate to present dangerousness:

> The offense committed by most prisoners serving life terms is, of course, murder. Given the high value our society places upon life, there is no motive for unlawfully taking the life of another human being that could not reasonably be deemed "trivial." The Legislature has foreclosed that approach, however, by declaring that murderers with life sentences must "normally" be given release dates when they approach their minimum eligible parole dates. (Pen.Code, § 3041, subd. (a).) The governing statute also states that the Board shall set a release date "unless it determines that the gravity of current convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Pen.Code, § 3041, subd. (b).) This language means a "more lengthy period of incarceration" is called for where the gravity of the offense or offenses of the prisoner in question is more indicative of a danger to the public if the prisoner is released than would ordinarily be the case. The reference in Board regulations to motives that are "very trivial in relationship to the offense" therefore requires comparisons; to fit the regulatory description, the motive must be materially less significant (or more "trivial") than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily presented.

In re Scott, 119 Cal.App.4th 871, 891 (2004).

        According to the record, petitioner, with the help of others, lured the murder victim to a location, beat the victim to the point he bled profusely and begged to be killed,

11

1  handcuffed and gagged him, placed him in the trunk of a car, transported him to a remote
2  location, placed him on his knees, proceeded to shoot him five times in the head area, reloaded
3  and shot him five more times, all so that petitioner and his co-defendants could steal from him.
4  Answer, Ex. 3 at 14-16. With respect to the attempted murder conviction, petitioner, after
5  already committing the above murder, attempted to kill the husband of a woman he was
6  romantically involved with by placing a bomb in the husband's car. Id. at 17. Such actions
7  could rightfully be described as demonstrating an "exceptionally callous disregard for human
8  suffering" for very trivial or inexplicable reasons.

Based on these facts, the undersigned finds the Board's conclusion fully supported by the record.

(2) Previous Record of Violence

In support of the denial, the Board found that petitioner had "on previous occasions, inflicted or attempted to inflict serious injury on a victim," had "a record of violent or assaultive behavior," and had "demonstrated an escalating pattern of criminal conduct and violence." Answer, Ex. 2 at 69.

Under California Law, a previous record of violence is found where "[t]he prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age." Cal. Code Regs., tit. 15 §2402 (c)(2).

According to the Los Angeles Superior Court's Probation Report:

> [Petitioner] was arrested for burglary on March 13, 1977, May 24, 1977, and September 15, 1977. Two of the cases were consolidated. In addition to burglary, [petitioner] had also been charged with forced oral copulation and attempted rape and those charges were later dismissed. One 21 year old female was the victim in three separate burglaries. She lived alone in Lancaster. The first two burglaries took place during the A.M. hours while she was taking a shower. In addition to her purse, diet pills were also taken. In the third burglary which occurred during the day, her apartment was ransacked and liquid soap, sauce and ketchup strewn over the kitchen, and her diet pills were taken. [Petitioner]

12

later told sheriff's deputies that he had wrecked the apartment because he was under the influence of "grass" and angry because he found no money. Another female was the victim in a burglary in Lancaster. She also lived alone and the burglary was committed between the hours of 11:30 P.M. and 9:00 A.M. [Petitioner] had gained entry through the window and had stolen money and credit cards. Another female was the victim in another burglary in Lancaster, and [petitioner] took her television set, a loaded .22 hand gun, rings and jewelry. In an additional burglary in Lancaster, [the] victim was another female whose apartment was burglarized in the morning while she was taking a shower and her purse was taken. In an additional attempted burglary in Lancaster, witnesses and the victim called sheriff's deputies after [petitioner] was observed looking in windows and prowling around the apartment building. A loaded .22 caliber revolver, gloves, and a key ring on the roof of the apartment building where [petitioner] had attempted to burglarize was recovered, and [petitioner] made full admissions. In still another count, [petitioner] entered the apartment of a female victim in the early afternoon while she was washing windows outside her residence. The phone had been ripped off in the kitchen and bedroom, and $20 stolen in addition to jewelry and a bottle of tranquilizers. The drapery cords had been cut and found with her blouse in the back yard. Three additional counts involved a 42 years old female and her 18 year old daughter, who were home in Lancaster in the afternoon. When the mother left the bedroom she was grabbed from behind by [petitioner], who choked her and told her that he would kill her if she said anything. Victim's daughter heard noises and came out of the bedroom and she was also grabbed about the neck by ]petitioner] who held both women. He took both into the bedroom where he forced both to get on their knees and placed their heads on the bed. They were ordered to put their hands behind them and [petitioner] used the drapery cords taken in the above burglary to tie their hands. He then took one of the victims socks and gagged her, and took the daughter to another bedroom while she was still tied with her hands behind her back. In the bedroom he pulled down the top of her dress and fondled her breasts and later [sat her] on the edge of the bed and while standing forced her to orally copulate him. He had no erection. Copulation lasted about a minute. [Petitioner] then forced the victim on the bed and hit her on the side of the head with his fist and pulled her pants down, and forcibly made her turn over on her stomach and placed his penis between her legs but had no erection. He then left the daughter and went to where the mother was still tied up, fondled her breasts while she protested while she was still kneeling with her hands tied behind her back. He then struck her twice in the back with his fists. She fell and he kicked her on the leg. At that time victim's son returned home and [petitioner] hearing noises ran from the apartment. [Petitioner] was arrested the same day and made full admission. During the pre-sentence investigation, [petitioner] admitted to eight burglaries as well as the sexual assault crimes,

13

alleging that he was high on drugs during all the crimes.
Answer, Ex. at 4-5.

Petitioner served two years in prison for these crimes and was paroled in 1979. Answer, Ex. 2 at 24. Six months after his release, and while still on parole, petitioner committed the underlying murder and attempted murder. Petitioner therefore had a previous record of violence and his criminal activity progressed from burglary, to sexual assault and attempted rape, to murder and attempted murder.

The Board's findings regarding the prior record are fully supported by the record.

### (3) Sadistic Sexual Offenses

In supporting the finding of unsuitability, the Board found that petitioner had "previously sexually assaulted another in a manner calculated to inflict unusual pain and fear upon the victim." Answer, Ex. 2 at 69.

Under California law, one factor tending to show unsuitability for parole is where the prisoner has committed sadistic sexual offenses. Cal.Code. Regs., tit. 15 § 2402(c)(4). A sadistic sexual offense is found where the prisoner "has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim." Id.

As noted above, petitioner committed a sexual assault during which he physically attacked a mother and daughter in their home, threatened to kill the mother, bound the victims, forced the daughter to orally copulate him, attempted to rape her, violently struck both women and only ceased the attack as a result of being interrupted. Such actions qualify as the sexual assault of another in a manner calculated to inflict unusual pain or fear upon the victim.

The Board's finding regarding unsuitability is fully supported by the record.

### c. Conclusion

As noted above, the court's analysis "is framed by the statutes and regulations governing parole suitability determinations" in California. Irons, 505 F.3d at 851. Thus it "must look to California law to determine the findings that are necessary to deem [petitioner]

14

unsuitable for parole, and then must review the record to determine whether the state court decision holding that these findings were supported by 'some evidence'" was an unreasonable application of the "some evidence" standard. Id.

Under California law the findings necessary to deem a prisoner unsuitable for parole must be based on "some evidence" that petitioner is a "current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." In re Lawrence, 44 Cal.4th 1181, 1212 (Cal. 2008). After careful review of this record, the undersigned finds the Board's decision is fully supported by the record.

Prior to incarceration, petitioner committed no less than eight burglaries, the victims of which were young women who typically lived alone. During the final burglary petitioner's criminal activity escalated into the violent sexual assault of a mother and daughter. After being incarcerated for two years, petitioner was on parole for six months before murdering one victim so that he could steal from the victim, and attempting to murder another victim because of his romantic involvement with that victim's wife. The circumstances of petitioner's crimes go beyond the minimum elements of his convictions, were the result of trivial provocation, and indicate exceptional cruelty and callousness, indicating that he remains a danger to public safety. See In re Weider, 145 Cal.App.4th at 588.

During his incarceration petitioner received a CDC 128 in May of 1986 for failing to report. Answer, Ex. 2 at 35. In September of 1989 petitioner received a CDC 115 for sending a "fish line" from the Administrative Segregation Unit. Id. In a March 3, 2000 evaluation it was concluded that petitioner "would pose a moderate to low degree of threat to the public at this time, if released from prison." Petition at 51. A September 5, 2000 psychological evaluation concluded that petitioner "no longer qualifies as a dangerous person" but also noted that petitioner "has developed defenses which consists largely of denial and repression, and he is probably seen by some as being a rigid person. Judgment is good, but insight is limited." Petition at 55.

1    After review of the entire record, the undersigned finds the Board's determination
2 of unsuitability fully supported.  Because the decision of the Board is supported by evidence in
3 the record its finding was not unreasonable and therefore not a violation of the right to due
4 process.

5    II.  Predetermined "No Parole Policy"

6    Petitioner claims that he was denied parole by the Board as a result of former
7 California Governor Gray Davis' "informal and illegal policy of denying parole to almost all
8 eligible life term prisoners." Petition at 37.

9    The parole denial challenged in this case occurred when Gray Davis was the
10 Governor of California.  The evidence submitted by petitioner demonstrates that under the Davis
11 administration, virtually every prisoner convicted of murder was found unsuitable for parole,
12 with rare exceptions.  The Ninth Circuit Court of Appeal has acknowledged that California
13 inmates have a due process right to parole consideration by neutral decision-makers.  See
14 O'Bremski v. Maas, 915 F.2d 418, 422 (9th Cir. 1990) (an inmate is "entitled to have his release
15 date considered by a Board that [is] free from bias or prejudice").  Accordingly, parole board
16 officials owe a duty to potential parolees "to render impartial decisions in cases and
17 controversies that excite strong feelings because the litigant's liberty is at stake." Id. (quoting
18 Sellars v. Procunier, 641 F.2d 1295, 1303 (9th Cir. 1981)).  Indeed, "a fair trial in a fair tribunal
19 is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136 (1955).

20   Based on the authorities cited above, petitioner is correct that he was entitled to
21 have his release date considered by a Board that was free of bias or prejudice.  However, even if
22 petitioner was found unsuitable for parole based on a "no parole" policy for life prisoners in
23 effect at that time, which does not appear to be the case, petitioner has failed to show prejudice.

24   Respondent asserts that petitioner had a more recent parole suitability hearing at
25 which time Gray Davis was not the Governor of California. See Answer at 21.  Petitioner has
26 offered no evidence suggesting that the Board was operating under a no-parole policy for life

16

prisoners after Governor Davis left office.  Therefore, petitioner has already received all the relief to which he would be entitled with respect to this claim: a new parole hearing before an unbiased Board panel.  Under these circumstances, petitioner has failed to establish that the outcome of a new suitability hearing would have changed before a different panel.  Accordingly, petitioner is not entitled to relief on this claim.  See O'Bremski, 915 F.2d at 423 (parolee failed to establish prejudice where a neutral parole panel at a new hearing would reach the same outcome).

## CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: November 24, 2008

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE